UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROY J. WATSON JR. and MARYSELA BADELL-WATSON, <br><br> Plaintiffs, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A <br><br> Defendant, | ) ) ) ) ) ) ) ) CASE NO. ) ) ) ) ) |

## COMPLAINT AND JURY DEMAND

## PARTIES

1. The Plaintiff, Roy J. Watson Jr. ("Mr. Watson"), is a resident of Lexington, Massachusetts.

2. The Plaintiff, Marysela Badell-Watson ("Mrs. Watson"), is a resident of Lexington, Massachusetts. (Mr. Watson and Mrs. Watson are collectively referred to as, the "Watsons").

3. The Defendant, JPMorgan Chase Bank, N.A. ("Chase"), is a National Association with a principal place of business of 1111 Polaris Parkway, Columbus, OH 43240.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 because the civil action arises under the Constitution, laws, or treaties of the United States.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred is this judicial district.

890559.2

1

## **FACTS**

6. In or about 1997, the Watsons purchased real property located at 160 Carroll Drive, Carlisle, MA (the "Property") for the sum of approximately $675,000.

7. The purchase of the Property was financed with two mortgages provided by Chase or its predecessors and/or affiliates.

   (a) The Watsons obtained a "first" mortgage in the sum of approximately $543,000 ("Mortgage One"); and

   (b) The Watsons obtained a "second" mortgage in the sum of approximately $57,000 ("Mortgage Two").

8. The Watsons obtained the mortgages through the services of Andy Mass – a Senior Mortgage Loan Officer at JP Morgan Chase.

9. Soon thereafter, the Watsons obtained a "third" mortgage, again through the services of Andy Mass ("Mortgage Three").

10. In or about 2003, the Watsons refinanced the Property with Chevy Chase Bank that offered a substantially lower interest rate ("Mortgage Four").

11. The Watsons obtained the Chevy Chase mortgages again through the services of Andy Mass.

12. In or about 2003, the Watsons obtained an equity line of credit from Citizens f/k/a Citizens Bank, N.A., with a limit of $210,000 at a rate of one percent below Prime, which was secured by the Property ("Mortgage Five").

13. In or about early 2005, the Watsons approached Andy Mass to replace the Chevy Chase Bank mortgage with one that adjusted over a longer fixed period.  Andy Mass then proposed a combined package of two mortgages ("Mortgage Six" and "Mortgage Seven") that

would total $980,000, with the second mortgage being for $200,000 at a rate of six percent.

14. The Watsons rejected that offer as it would do nothing more than replace an adjustable mortgage of $210,000 at one percent below Prime with a fixed mortgage of $200,000 at a fixed rate of six percent.

15. Chase's agent(s) and attorney(s), including Andy Mass and Roseann Conti, Esquire, Chase's attorney, subsequently followed up the rejected offer by advising the Watsons that the equity line of credit from Citizens had not been properly recorded, and therefore it was not a valid mortgage, and that if the Watsons agreed to the refinance, Chase would issue all of the proceeds from Mortgage Six directly to the Watsons.

16. The Watsons accepted the new proposal of Andy Mass who again refinanced the Watsons and placed them with Mortgage Six and Mortgage Seven from Chase (the "Chase Mortgages") that were secured by the Property.

   a.   Mortgage Six was in the sum of $780,000 and was for the purpose of refinancing the existing mortgage from Chevy Chase Bank (Mortgage Four); and

   b.   Mortgage Seven was in the sum of $200,000, which was paid directly to the Watsons as cash.

17. As part of this refinance, the Watsons were required to pay for a title insurance policy issued by Stewart Title Guaranty Company to JP Morgan Chase Bank to guarantee clear title to Mortgage Six for $780,000.

18. Chase's representatives misrepresented the validity of Mortgage Five.  Contrary to Chase's express assurances, Citizens held a valid mortgage duly recorded with the registry of deeds.

19. Because of Chase's agents' errors, Mortgage Six was technically second in priority

and Mortgage Seven was third in priority, leaving the Property encumbered by a total of three mortgages.

20. Chase's closing attorney, Roseanne Conti, failed to ensure that any of the mortgage discharges were filed for any of the prior mortgages from the Watson's original purchase. In addition, Ms. Conti did not file a discharge for any of the Chevy Chase Bank mortgages, which subsequently provided a claimed basis for one of Chase's five prior, including the (bad faith/wrongful) denials of the Watsons' four Short Sale requests.

21. Mr. Watson's law practice is built on a strong economy that creates a high demand for employers who seek to hire skilled workers when there is a low unemployment rate. The dramatic downturn in the economy that began in 2001 had a direct and profoundly negative impact on the Watsons' income and their ability to maintain all of the costs necessary to support all existing loans and the cost of maintaining the property. Mr. Watson's income began a steady decline that did not "level off" until 2005 at a rate that was two-thirds less than his prior gross income.

22. In or about 2007, the Watsons reluctantly decided to sell the Property as the only realistic means of stopping what had become an unsustainable net financial loss. It was only then that the Watsons learned that because of the misrepresentations and fraudulent actions made by Chase's agents, the Property was encumbered by three mortgages instead of the two they had been led to believe, for a total of $1,190,000:

(i)   Citizens Equity Line of Credit - ~$210,000, (Mortgage Five);

(ii)  Mortgage Six - ~$780,000; and

(iii) Mortgage Seven - ~$200,000.

23. The Watsons immediately began contacting Chase both to notify it that they were

having difficulty making payments on the mortgages and to try and work out a favorable resolution to this newly discovered problem.

24. In or about April 2008, Mr. Watson was finally able to contact the legal department at Chase and began a dialogue that included an explanation of the problem, a proposed solution to the problem relying on a title insurance policy that Mr. Watson had been required to purchase on Chase's behalf as part of the 2005 closing, providing a copy of the title insurance policy to Chase's legal department explaining the process that would provide full payment and subsequently cooperating with the legal department to assist them in filing a "Notice of Intention to Claim" with the title insurance company, Stewart Title.

25. Mr. Watson was then told he would next have to contact Chase to arrange for permission to engage in a short sale.

26. Mr. Watson made multiple calls to Chase over the course of next several months and was constantly "re-assigned" to a new representative. Each new representative explained that s/he could not help the Watsons so long as they were current on their mortgage obligations. Chase would not even discuss any alternatives and would not entertain the notion of a short sale as long as all accounts were current. Each Chase representative made it clear to Mr. Watson that in order for Chase to even consider a short sale, the Watsons would have to default on their loans – thereby encouraging the Watsons to default on their Chase Mortgages.

27. Based on Chase's unwavering and inflexible position, the Watsons defaulted on their loans with Chase, as the only way to begin a dialogue, with the expectation that the Chase would approve a short sale. Prior to the default, the Watsons had never defaulted on any loan obligation and had maintained a credit rating of over 800.

28. The default, which was essentially recommended by Chase, greatly negatively

impacted the Watsons' credit ratings, their ability to refinance the mortgages, and their ability to obtain credit for any other purpose. This directly negatively impacted Mr. Watson's law practice since, as a solo practitioner, Mr. Watson relied heavily on his credit to maintain his firm when business was slow.

29. As a result of the default, the Watsons were denied credit. Moreover, as a result of the default, several of the Watsons' other lenders held the Watsons to be in universal default and either canceled or drastically reduced the amount of credit extended to the Watsons.

30. The Watsons engaged the services of one of the most accomplished and experienced real estate brokers in the area and invested over $40,000 in improvements to the Property which included extensive carpentry, the addition of trim boards throughout, a new wall and windows in the kitchen sun room and exterior painting to increase the likelihood it would sell quickly and sell for the highest possible price. This resulted in more visits to this property than all other listings combined.

31. However, the collapse of the real estate market meant no offers remotely close to the amount required to convey clear title on a property with three mortgages and a total indebtedness of $1,190,000.

32. In 2008, the highest offer the Watsons received was a $780,000 offer from a potential buyer, the Bently Group LLC, which was later raised to $810,000 in return for the Watsons agreeing to extend the closing date.

33. In 2008, having finally obtained a willing buyer, the Watsons were able to submit their first short sale request with Chase.

34. The extended closing date for the sale of the Property was set to occur on December 30, 2008.

35. Throughout this time, Mr. Watson was in regular and constant communication with Chase seeking payment of his loans. During several of these calls, it was suggested to Mr. Watson that if the Watsons wanted their short sale application to be viewed favorably, the Watsons should become current on both of the Chase Mortgages, including paying amounts that were the result of Chase's advice to default in the first place.

36. Concerned that time would run out on the agreed upon closing date, and based on Chase's recommendation to become current on both loans so that their short sale application would be approved, the Watsons arranged with Chase to make payments that would bring both loans current.

37. Nonetheless, the closing for the purchase and sale of the Property did not occur as Chase did not approve the short sale request. During the entire process, the Watsons contacted Chase on at least a weekly basis. Chase repeatedly changed the Watsons primary account representative making the process extremely difficult and laborious for the Watsons.

38. During the process of the first failed short sale attempt, the potential buyer alerted the Watsons that no discharges had ever been filed for any of the four refinanced mortgages (Mortgage One, Mortgage Two, Mortgage Three, and Mortgage Four), which included the three original Chase mortgages (Mortgage One, Mortgage Two, and Mortgage Three), and the 2005 Chevy Chase mortgage (Mortgage Four). Chase's closing attorney, Roseanne Conti not only failed to record the discharge of the mortgage from Chevy Chase Bank that she caused to be paid at the 2005 closing, but she also failed to ensure that any of the prior Chase mortgage discharges had been recorded. As a result, the Watsons themselves had to obtain all four of the discharges for the previously refinanced mortgages from Chase (Mortgage Three) and Chevy Chase Bank (Mortgage One) in preparation of the December 30, 2008 closing.

39. The Watsons never received any written response from Chase to their first short sale request.  The only response from Chase was a verbal statement from a Chase representative (who was then "assigned" to the Watsons' case because of the "newly discovered" third (Citizens) mortgage (Mortgage Five)) that the short sale could not be approved until "legal" signed off and approved it.

40. Mr. Watson tried to explain that he had already contacted the legal department, that he had explained the entire situation to them, that he had been working to assist them to and by providing them with a copy of the title insurance policy and assisted them in preparing and filing a Notice of Intention to Claim on the title insurance policy to recover any loss caused by the first mortgage.

41. Mr. Watson attempted to call his most recent contact with the legal department, Ms. Rita Lewis, but she did not take or return any of his calls.  Mr. Watson then called Mr. Orest Lechnowsky who had previously been identified to him as the "head of legal."

42. Mr. Lechnowsky remembered the prior conversation with Mr. Watson and the issues involved, and promised that he would have Ms. Lewis call Mr. Watson.  Ms. Lewis did subsequently call Mr. Watson, but could only offer that Chase was attempting to get Citizens to agree to subordinate their current first mortgage (Mortgage Five).

43. In or about early 2009, the Watsons retained the services of a broker who was experienced in the preparation and filing of short sale requests, and with his assistance submitted a second short sale application, again with the Bently Group LLC as the potential buyer.  Once again the Bently Group LLC offered $810,000 for the Property.  This time the short sale application – following months of additional delay - was formally denied because Chase claimed (falsely) that the Property was "encumbered" by seven unsatisfied mortgages.  Astonishingly, in

addition to the three existing mortgages that had been the focus of discussions with Chase since before the first short sale request, Chase was including all four of the previously satisfied mortgages – three of which had been Chase mortgages and one of which was the Chevy Chase mortgage for which Chase's attorney paid but had failed to file a discharge, as the claimed reason to deny the short sale request.

44. Prior to receiving the formal written denial, the Watsons – through their broker – had been informally advised of Chase's reason, seven alleged unpaid mortgages, for intending to deny the short sale request. The Watsons immediately provided faxed and electronic copies of all four discharges – three from Chase and one from Chevy Chase – that had not yet been recorded.

45. However, even after receiving copies of all four discharges, Chase refused to reconsider their position and subsequently issued a written denial – denying the short sale request claiming that there were seven outstanding unpaid mortgages.

46. In or about early 2010, the Watsons submitted a third short sale application, again with the Bently Group LLC as the potential buyer. However, by this point all property values nationwide, including the value of the Property, had fallen dramatically. For this reason the Bently Group LLC's new offer was for only $500,000 for the Property. The Bently Group LLC clearly indicated to Chase as part of their offer that it was ready, willing, and able to increase the offer to an amount that would reflect fair market value for the Property as determined by a third-party appraiser.

47. In response to the Watsons most recent (third) short sale request, Chase obtained an appraisal of the property. After receiving the appraisal, Chase summarily rejected this offer, claiming simply that it was too low, and refusing to provide any type of counter offer. When

asked directly to provide the results of their appraiser in an effort to try and determine what might be required, Chase categorically refused to disclose their appraised value of the Property. Chase notified the Watsons that the file was closed, and if they wanted to know the new appraised value, they would need to submit a new short sale application.

48. As a result, the Watsons submitted yet another (fourth) short sale application, again with the Bently Group LLC as the proposed buyer  This time the offer was unilaterally raised to $600,000, with the Bently Group LLC again stating to Chase that it was willing to increase the offer to fair market value as determined by a third party appraiser.  Chase again rejected this offer, but in doing so it did provide information that their last appraisal (obtained more than a year earlier, in early summer of 2010) was for $730,000, which was only $80,000 less than the offers contained in the first two short sale applications, but greater than current fair market value of the Property.

49. In or about 2007, the Watsons informed Chase that their agent had negligently handled the closing at that Chase should make a claim against their title insurance policy that had been purchased for them by the Watsons as part of the 2005 closing for any and all losses suffered by Chase caused by the Citizens equity line of credit as a valid, previously recorded mortgage.

50. After being notified of its agents' negligence, Chase made a claim to the title insurance company.  As a result of Chase's claim to the title insurance company, the title insurance company paid Citizens $200,000 and Citizens assigned its entire interest in the mortgage to the title insurance company, which was then moved from a first to a third position. As a consequence, Mortgage Six was moved from second position to first position and Mortgage Seven was moved from third position to second position.

51. In or about late 2011, the Watsons paid off Mortgage Six.

52. On December 28, 2011, the Watsons filed suit against Chase in Middlesex Superior Court, Civil Action No. 1181CV04679.

53. In 2014, the Watsons reached a settlement with Chase. The settlement was memorialized in a document entitled Confidential Release and Settlement Agreement (the "Settlement Agreement").

54. The Settlement Agreement was dated June 25, 2014 and Chase, by its authorized representative, executed the agreement on July 11, 2014.

55. The terms of the Settlement Agreement required that Chase take certain actions, including, among other things: (i) take title to the Property; (ii) waive any deficiency; and (iii) make the following reporting to the major credit reporting agencies (Equifax, Experian, Innovis, and TransUnion) (collectively, the "Credit Reporting Agencies") concerning the Watsons' account: "Account previously in dispute, now resolved."

56. Chase has not complied with its obligations under the Settlement Agreement.

57. The Watsons have not excused Chase's performance under the Settlement Agreement.

58. Chase's failure to comply with the terms of the Settlement Agreement constitutes a breach.

59. Despite the terms of the Settlement Agreement, Chase has refused to take title to the Property and Chase has failed to make the required reports to the credit reporting agencies. This has caused continuing harm to the Watsons as they remain the record owner of the properties.

# CAUSES OF ACTION
## COUNT I
### Breach of Contract

60. The Watsons incorporate by reference all allegations in this complaint.

61. The terms of the Settlement Agreement required that Chase take certain actions, including, among other things: (i) take title to the Property; (ii) waive any deficiency; and (iii) make the following reporting to the Credit Reporting Agencies concerning the Watsons' account: "Account previously in dispute, now resolved."

62. Chase has not complied with its obligations under the Settlement Agreement.

63. Chase has breached the Settlement Agreement.

64. Chase's failure to comply with the terms of the settlement agreement has harmed, and continues to harm, the Watsons.

65. As a result of the above described conduct, the Watsons have sustained damages.

## COUNT II
### Violation of the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq.*).

66. The Watsons incorporate by reference all allegations in this complaint.

67. The Fair Credit Reporting Act mandates that Chase provide the Credit Reporting Agencies complete and accurate information.

68. Chase represented that it could accurately report, based on the terms of the Settlement Agreement, the following to the Credit Reporting Agencies concerning the Watsons' account: "Account previously in dispute, now resolved." These terms are reflected within the Settlement Agreement.

69. Nonetheless, Chase has reported to the Credit Reporting Agencies that it has begun foreclosure proceedings.

70. The statements made by Chase to the Credit Reporting Agencies concerning the

Watsons are false.

71. Despite the terms of the Settlement Agreement, Chase willfully reported false information to the credit reporting agencies concerning the Watsons.

72. Chase's conduct violates the Fair Credit Reporting Act.

73. As a result of the above described conduct, the Watsons have sustained damages.

74. In addition, the Watsons are also entitled to punitive damages.

### COUNT III
**Violation of the Massachusetts Credit Reporting Act (M.G.L. c. 93, § 50 *et seq*.)**

75. The Watsons incorporate by reference all allegations in this complaint.

76. The Massachusetts Credit Reporting Act mandates that Chase provide the Credit Reporting Agencies complete and accurate information.

77. Chase represented that it could accurately report, based on the terms of the Settlement Agreement, the following report to the Credit Reporting Agencies concerning the Watsons' account: "Account previously in dispute, now resolved."

78. These terms are reflected within the Settlement Agreement.

79. Nonetheless, Chase has not made the agreed upon reports to the Credit Reporting Agencies.

80. The statements made by Chase to the credit reporting agencies concerning the Watsons are false.

81. Despite the terms of the Settlement Agreement, Chase willfully reported false information to the credit reporting agencies concerning the Watsons.

82. Chase's conduct violates the Massachusetts Credit Reporting Act.

83. As a result of the above described conduct, the Watsons have sustained damages.

84. In addition, the Watsons are also entitled to attorneys' fees.

## COUNT IV
**Unfair and Deceptive Practices (M.G.L. c. 93A)**

85. The Watsons incorporate by reference all allegations in this complaint.

86. In accordance with M.G.L. c. 93, § 68, the Defendant's violation of the Massachusetts Credit Reporting Act constitutes a violation of M.G.L. c. 93A.

87. As a result of the above described conduct, the Watsons have sustained damages.

88. In addition, the Watsons are entitled to multiple damages and attorneys' fees.

## COUNT V
**Declaratory Relief and Permanent Injunction**

89. The Watsons incorporate by reference all allegations in this complaint.

90. An actual controversy has arisen and now exists between the Watsons and Chase concerning Chase's obligations to report to the Credit Reporting Agencies.

91. The Watson's desire a judicial determination of the Parties' rights and duties and a declaration that Chase must make the following report to the Credit Reporting Agencies on behalf of the Watsons "Account previously in dispute, now resolved", and take title to the Property.

92. The Watsons also request that a permanent injunction be entered prohibiting Chase from reporting to the Credit Reporting Agencies that it has begun foreclosure proceedings and to require Chase to take title to the Property.

## PRAYER FOR RELIEF

The Watsons demand judgment against the Defendant and request that this Honorable Court enter the following relief:

1. Award the Watsons damages as proven, including interest, costs, attorneys' fees and, where applicable, multiple damages in accordance with Massachusetts and

Federal law;

    2.    Award the Watsons attorneys' fees, interest and costs;

    3.    Award the Watsons punitive damages and/or multiple damages;

    4.    Order that Chase correct the errors on the Watsons' credit reports caused by Chase;

    5.    Order that Chase take title to the Property; and

    6.    Award the Watsons such other relief as this Court deems just, equitable and appropriate.

## DEMAND FOR JURY TRIAL

The Watsons hereby demand a jury trial on all claims so triable.

Respectfully submitted,
Roy J. Watson, Jr. and Marsela Badell-Watson
By their attorneys,

/s/ *Charles F. Rodman*

Charles F. Rodman, BBO#641216
Chuck.Rodman@gesmer.com
Gesmer Updegrove LLP
40 Broad Street
Boston, Massachusetts 02109
Telephone: (617) 350-6800
Facsimile: (617) 350-6878

Dated: July 6, 2015